# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 17, 2014

## STATE OF TENNESSEE v. TIMOTHY HOWARD CUNNINGHAM

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2013-A-421      Cheryl A. Blackburn, Judge**

---

**No. M2013-02844-CCA-R3-CD - Filed July 25, 2014**

---

A Davidson County Criminal Court Jury convicted the appellant, Timothy Howard Cunningham, of reckless endangerment by use of a deadly weapon, namely a motor vehicle. The trial court sentenced him to four years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Jeffrey A. DeVasher (on appeal), Gary Tamkin (at trial), and Kristin Neff (at trial), Nashville, Tennessee, for the appellant, Timothy Howard Cunningham.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Lauren Spero and Jeff Burks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On February 15, 2013, a Davidson County Grand Jury returned a multi-count indictment, charging the appellant with aggravated assault, reckless endangerment accomplished with a deadly weapon, and driving on a revoked license. Prior to trial, pursuant to a motion filed by the State, the trial court severed the driving on a revoked license charge from the remaining charges.

At trial, Latosha Dixon Bradford[1] testified that at the time of the offense, she and the appellant had known each other for five years. During the last year, they "became more than just friends." In December 2011, the relationship had just ended.

Bradford said that on the evening of December 29, 2011, the appellant called Bradford and asked to borrow money for gasoline. Around 7:30 or 7:45 a.m. the next morning, Bradford stopped by the appellant's house to loan him the money. As she and the appellant were walking toward the living room, she noticed that a light was on in the bathroom. She asked the appellant who was in the bathroom, and he replied that his cousin was there. Bradford also saw a woman's purse on an ottoman in the living room. She suspected that the appellant's guest was not his cousin and confronted him. Shortly thereafter, the appellant's female guest came into the living room and introduced herself as "Sherry." Bradford confronted the appellant about being with another woman, and Bradford, the appellant, and Sherry argued about why Sherry was there. The argument ended after Bradford noticed that it was 7:50 a.m. and decided to leave in order to get to work. As Bradford left, she took the appellant's cellular telephone so that she could determine if he was concealing anything from her. She said the appellant knew she would return the telephone later that evening.

Bradford said that seven or eight minutes later, she was driving in the far left lane on Briley Parkway past Two Rivers and noticed that the appellant was following her in a white, Ford Crown Victoria. He was screaming at her, but she could not discern what he was saying. Bradford drove her vehicle into the right lane to take a detour, hoping to dissuade the appellant from following her to work. Bradford then took the Lebanon Road exit, got into the far right lane, and prepared to make a right turn. Although several other vehicles were on the exit ramp, the appellant drove up beside her on the left, parked "catty-corner" in front of her vehicle, and quickly exited his vehicle. When she saw the appellant approaching, she backed up, drove around the appellant's vehicle, and turned onto Lebanon Road.

Bradford said that she called 911 to report the appellant's behavior.[2] As she was speaking with the 911 operator, Bradford got into the left lane, driving sixty or seventy miles per hour. The appellant continued his pursuit. Several times, the appellant approached from behind as if he intended "to bump the back" of her vehicle. Although other vehicles were in front of Bradford, she wove into open spaces in the right lane then the left lane to prevent the appellant from forcing her to collide with the other vehicles. While Bradford was in the left lane, the appellant drove into her lane, forcing her to cross two yellow lines into the lane

---

[1]Bradford testified that she had recently married and that Dixon was her maiden name.

[2]The recording of the 911 call was played for the jury.

of oncoming traffic. However, no vehicles were in the lane at that time. Less than thirty seconds later, she returned to the left lane.

Bradford said that Lebanon Road turns into Hermitage Avenue. After driving on Hermitage Avenue for a while, Bradford saw that a stationary "MTA bus" was blocking the street. The appellant caught up with her, pulled his vehicle in front of hers at an angle, and exited the vehicle. The 911 operator told Bradford to get away from the appellant. Bradford quickly put her vehicle in reverse, drove over a median, and began traveling in the opposite lane back toward Lebanon Road.

Bradford said that the appellant continued to follow her and that she then turned left onto Fairfield Avenue to evade him. However, Fairfield Avenue was a dead-end street lined with businesses. The appellant pulled up on her left side, parked his vehicle in front of hers, and jumped out of the vehicle. Bradford put her vehicle into reverse and began driving backward into a driveway. The appellant got into his vehicle, drove in reverse, and "rammed" his vehicle into her vehicle. Once again, the 911 operator told Bradford to try to get away. Because none of the businesses were open, Bradford believed her safest option was to drive away. She did not look back to see the appellant's response. Bradford estimated that the incident lasted ten to twenty minutes. She said that during the incident, she was afraid that she would not "make it out of the situation."

Bradford said that after she left Fairfield Avenue, she got on the interstate, took the Rosa Parks Boulevard exit, and waited at a Tiger Mart for an officer to arrive. Afterward, an officer took her statement, and she followed him to the police department. While she was there, an officer took photographs of the damage to her vehicle. The right taillight of her vehicle was broken. The passenger side doors of the vehicle were damaged, including "a hole into the vehicle and[,] . . . the door was basically popping out a little bit on the back door." Scuff marks and white paint from the appellant's vehicle were on the front passenger door of her vehicle.

Bradford said that later that afternoon, she went to her mother's house and discovered that the appellant was there. Bradford called the police, who came and arrested the appellant. The appellant left his vehicle in Bradford's mother's driveway. Bradford took photographs of the vehicle, which depicted a cracked taillight and scuff marks on the back and rear passenger side.

On cross-examination, Bradford said that during the incident, she was unsure of the names of the roads on to which she was turning. However, the day after the incident, she retraced her steps to verify the route. She stated that after she evaded the appellant on Fairfield Avenue, she drove toward the interstate. The appellant pursued her but was stopped

-3-

by traffic at a red light.

Bradford acknowledged that at the preliminary hearing, she testified that the appellant threatened to call the police and have them come to her workplace and that she, therefore, decided to take the Lebanon Road exit instead of going to work. She asserted that when listening to the audio recording of her 911 call, "a couple of times you can even hear the squealing of tires."

Bradford stated that while she was at the appellant's house, she got frustrated with "the whole situation" and that she "felt betrayed." She explained that the appellant's intimate relations with other people caused her to be concerned about her health. She took the appellant's iPhone "to see what information [she] could find out about what else may have been taking place." She denied taking the appellant's telephone as an act of revenge. When Bradford got into her vehicle to leave, she placed the appellant's telephone on her passenger seat. The appellant came out of the house, stood on the porch, and watched her leave. He did not pursue Bradford at that time because he was arguing with Sherry about Bradford. Bradford denied taunting the appellant with his telephone as she left the residence.

Bradford said that the appellant forced her to drive into oncoming traffic because he was angry and wanted his telephone. Wanting to rid herself of his cellular telephone, Bradford tossed it out of her vehicle window. She did not know if the appellant saw her discard the telephone.

Metro Police Officer Arthur Danner[3] testified that on December 30, 2011, he was dispatched to investigate a domestic violence call. At approximately 8:00 a.m., he went to a Tiger Mart located at the intersection of Rosa Parks Boulevard and Dominican to meet with Bradford. When they spoke, Bradford appeared angry and upset. Officer Danner saw the damage that had been done to Bradford's vehicle. After the conversation, a warrant was issued for the appellant's arrest.

Nashville Police Officer Brian Otto testified that on December 30, 2011, he was dispatched to 1301 South Graycroft Avenue to serve an arrest warrant on the appellant.

The forty-two-year old appellant testified that he had known Bradford for at least four years. They had never had a "committed" relationship. Initially, they were friends; however, during the last year they became intimate. On the evening of December 29, 2011, he spoke with Bradford by telephone, and they arranged for her to come to the appellant's residence the next morning. When she arrived as scheduled, he stepped outside onto the porch because

---

[3]As of the time of the hearing, Officer Danner had retired from the police force.

he had company and knew Bradford could be "hysterical." They spoke for a while, and the appellant turned to go back inside the house. Bradford then forced her way into the appellant's house and discovered that he had a female guest. The appellant and Bradford argued, and the appellant walked to the door and asked her to leave. Bradford walked outside, and the appellant stayed in the house. He heard a car horn and went to the door. Bradford began screaming, cursing and taunting him with his phone. Upon realizing that Bradford had taken his cellular telephone, the appellant went into the house, grabbed his car keys, and followed her to retrieve his telephone.

The appellant said that he was not in a hurry because he knew Bradford was going to work. When Bradford turned onto Lebanon Pike, the appellant assumed she had seen him. He pulled up beside her, on the shoulder of the road, and rolled his window down. Bradford also had her window down. He begged her to return his telephone, warning her that he did not want to call the police. After he got out of the vehicle, Bradford drove away. The appellant got back into his vehicle and continued to follow Bradford, fearing she would destroy his telephone.

The appellant said that although he and Bradford stopped a "couple of times," she never returned his telephone. He acknowledged that they were traveling at a high rate of speed and that they drove over medians "back and forth," but he attributed the pace and route to Bradford. The appellant denied intentionally backing into Bradford. He explained:

> As we were going down Lebanon Pike, she was going over the
> medians. Several times she had gone over the medians. Several
> times she had gone over the medians back and forth. At one
> point I went over the median as she was coming – she made – it
> was a U-turn that she made. And as she was making a U-turn,
> I was coming that way. I stopped and she kept going, and that's
> when the collision happened.

The collision damaged the back right side of his vehicle and the side and rear of Bradford's vehicle. The appellant contended that the collision occurred when Bradford made a U-turn on Hermitage Avenue, after they had passed Fairfield Avenue but before they had reached the overpass.

The appellant said that after the collision, he stopped pursuing Bradford. He said that he went to the justice building to make a complaint against Bradford for stealing his telephone; however, he was unable to complete his task because "they were on vacation."

The appellant said that later that evening, he went to the home of Bradford's mother

to "just explain to her parents exactly what happened and the reason that it happened." While he was there, the police arrived and arrested him. The appellant denied that he pursued Bradford with the intention of hurting her.

On cross-examination, the appellant said that he followed Bradford for the sole purpose of retrieving his telephone. He said, "I didn't see anything criminal about me trying to seek out to get – you know, get my property, just ask for my property that was just stolen from my home or taken from my home." He acknowledged that Bradford's response to his pursuit indicated that she was trying to get away from him.

The jury convicted the appellant of reckless endangerment by use of a deadly weapon, namely a motor vehicle, a Class E felony. However, the jury was unable to reach a verdict on the aggravated assault charge. The trial court sentenced him as a Range II, multiple offender to four years in the Tennessee Department of Correction. The appellant appeals, challenging the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Felony reckless endangerment is defined as "engaging in conduct . . . which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). "Reckless endangerment committed with a deadly weapon is a Class E felony." Tenn. Code Ann. § 39-13-103(b)(2). A "deadly weapon" is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-11-106(5)(B). The definition includes motor vehicles, depending upon the manner in which the motor vehicle is used. See State v. Tate, 912 S.W.2d 785, 787-88 (Tenn. Crim. App. 1995). Our supreme court has explained that in order for the threat "to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999).

The evidence in the light most favorable to the State revealed that after Bradford went to the appellant's house, they argued about his involvement with another woman. When Bradford left, she took the appellant's cellular telephone to investigate his infidelity. The appellant did not see her take the telephone, but his female guest did. Bradford drove away and, seven or eight minutes later, noticed that the appellant was following in his vehicle. The appellant was screaming at her. To prevent the appellant from coming to her workplace, Bradford took the Lebanon Road exit. While Bradford was on the exit ramp, the appellant partially blocked her vehicle with his and jumped out of his vehicle. Bradford evaded the appellant, but he continued to pursue her at speeds around sixty or seventy miles per hour. In order to avoid a collision with the appellant, Bradford was required to weave in and out of traffic. Bradford said that when she was in the left lane, the appellant drove into her lane and forced her to drive over two yellow lines into the lane of oncoming traffic. Less than thirty seconds later, she regained control of her vehicle and returned to the left lane. When Bradford discovered her path was blocked by a bus, the appellant again pulled in front of her vehicle and exited his vehicle. Bradford reversed her vehicle, drove over a median, and began traveling in the opposite lane back toward Lebanon Road. After further pursuit, Bradford turned onto Fairfield Avenue and discovered that it was a dead-end road. The appellant followed her, blocked her vehicle, and got out of his vehicle. To evade the appellant, Bradford reversed her vehicle into a driveway. The appellant put his vehicle into reverse and slammed into her vehicle. Bradford managed to drive away and later spoke with a police officer about the incident.

The appellant contends that the only incidents which could have possibly endangered Bradford were (1) when the appellant forced her vehicle over the center line and (2) when he collided with her vehicle. However, we note that the appellant's reckless endangerment of Bradford was not limited to a single incident but was based upon his continuing course of conduct. See State v. Ramsey, 903 S.W.2d 709, 713 (Tenn. Crim. App. 1995). The proof at trial revealed that during the vehicle chase, Bradford was compelled to weave in and out of traffic to avoid a collision, that the appellant forced her to drive into an oncoming lane of

traffic, and that the appellant deliberately rammed her vehicle with his. The appellant contends that because there were no vehicles in the other lane at the time Bradford was forced into oncoming traffic and the only damage to Bradford's vehicle was to the passenger side, the danger to Bradford was merely possible, not probable. We disagree. See State v. Rocky Joe Houston, No. E2011-01855-CCA-R3-CD, 2013 WL 500231, at *7 (Tenn. Crim. App. at Knoxville, Feb. 11, 2013) (sustaining a reckless endangerment conviction upon proof that the defendant tried to force the victim's vehicle into oncoming traffic); State v. Dennis Jarrett, No. W2005-02977-CCA-R3-CD, 2007 WL 1094149, at *3 (Tenn. Crim. App. at Jackson, Apr. 11, 2007) (sustaining a reckless endangerment conviction when a defendant twice drove toward a parked vehicle, in which a driver sat, in an attempt to cause a collision); State v. Johnny C. Menifee, No. M2005-00708-CCA-R3-CD, 2006 WL 2206067, at *5 (Tenn. Crim. App. at Nashville, July 31, 2005) (sustaining a reckless endangerment conviction after a defendant drove toward the victim's parked vehicle, swerved at the last minute, and narrowly avoided a collision). Moreover, this court has previously noted that "[t]he fact that serious injury was not inflicted as a result of the [a]ppellant's actions is irrelevant to the offense." Menifee, No. M2005-00708-CCA-R3-CD, 2006 WL 2206067, at *5. We conclude that the proof was sufficient to sustain the appellant's conviction for reckless endangerment.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE